# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

FELISHA COTTLE, on behalf of     )
herself and others similarly-situated,     )
        Plaintiff,     )
    )
       v.     )     CAUSE NO.: 2:11-CV-95-PRC
    )
FALCON HOLDINGS MANAGEMENT, LLC     )
and FALCON HOLDINGS MANAGEMENT,     )
LLC d/b/a CHURCH'S CHICKEN,     )
        Defendants.     )

## OPINION AND ORDER

This matter is before the Court on Defendant Falcon Holdings Management, LLC's Motion for Summary Judgment [DE 87], filed by Defendants Falcon Holdings Management, LLC and Falcon Holdings, LLC d/b/a Church's Chicken on June 29, 2012. Plaintiff Felicia Cottle filed a response on July 27, 2012. Defendants have not filed a reply, and the time to do so has passed.

## PROCEDURAL BACKGROUND

Plaintiff Felisha Cottle filed the instant cause of action against Defendant Falcon Holdings Management LLC d/b/a Church's Chicken on March 15, 2011. Falcon Holdings Management LLC d/b/a Church's Chicken filed an Answer on May 13, 2011.

On August 18, 2011, Ms. Cottle file a Motion to Certify as a Collective Action. On November 3, 2011, the Court conditionally certified this matter as a collective action. On November 18, 2011, Ms. Cottle filed a Motion for Approval of Proposed Notice to Potential Opt-In Plaintiffs, which the Court granted on December 6, 2011, and which was placed on the docket on January 27, 2012.

On April 11, 2012, Ms. Cottle filed an Amended Complaint, with leave of Court, naming Defendants Falcon Holdings Management, LLC and Falcon Holdings, LLC d/b/a Church's Chicken.

Count I alleges a claim of "race and color discrimination" under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, and Count II alleges Title VII retaliation. Count III alleges failure to provide reasonable accommodations and disability discrimination under the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, *et seq.*, and Count IV alleges ADA retaliation. Count V alleges failure to pay overtime wages under the Fair Labor Standards Act, 29 U.S.C.§ 201, *et seq.*, and Count VI alleges FLSA retaliation. Count VII alleges a state law claim of negligent retention and supervision, while Count VIII alleges a state law claim of intentional infliction of emotional distress.

On April 18, 2012, Defendants filed an Answer to the Amended Complaint.

On September 20, 2012, the Court denied Defendants' Motion to Decertify the Class Action. However, the Court granted in part Defendants' Motion for Discovery Sanctions, dismissing with prejudice opt-in Plaintiffs Jasmine Smith, Jacqueline Coley, Kendra Jackson, Jasmine Marie Jackson, Lisa Stubbs, Toinette Neal, Alanza McCullum, Kyle Ferguson, Takyla Jones, Latoya Hughes, and William Lockhart. The Court also granted in part and denied in part as moot Defendants' Partial Motion for Summary Judgment as to the Claims of Certain FLSA Opt-In Plaintiffs, granting summary judgment in favor of Defendants against opt-in Plaintiffs Tommy Conley, Roy Lee Gail, Shalonda Jones, Petrina Burpo, and Parthenia Ford. Thus, the collective action claim for unpaid overtime wages in Count V of the Amended Complaint remains pending as to collective action class members Felicia Cottle, Fred Culbreath, and Deon Thompson.

The parties filed forms of consent to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. Therefore, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c).

## SUMMARY JUDGMENT STANDARD

The Federal Rules of Civil Procedure mandate that motions for summary judgment be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 further requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)). "[S]ummary judgment is appropriate – in fact, is mandated – where there are no disputed issues of material fact and the movant must prevail as a matter of law. In other words, the record must reveal that no reasonable jury could find for the non-moving party." *Dempsey v. Atchison, Topeka, & Santa Fe Ry. Co.*, 16 F.3d 832, 836 (7th Cir. 1994) (citations and quotations omitted).

A party seeking summary judgment bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *See Celotex*, 477 U.S. at 323; Fed. R. Civ. P. 56(c). The moving party may discharge its initial responsibility by simply "'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. When the nonmoving party would have the burden of proof at trial, the moving party is not required to support its motion with affidavits or other similar materials negating the opponent's claim. *Celotex*, 477 U.S. at 323, 325; *Green v. Whiteco Indus., Inc.*, 17 F.3d 199, 201 n.3 (7th Cir. 1994); *Fitzpatrick v. Catholic Bishop of Chi.*, 916 F.2d 1254,

1256 (7th Cir. 1990). However, the moving party, if it chooses, may support its motion for summary judgment with affidavits or other materials, and, if the moving party has "produced sufficient evidence to support a conclusion that there are no genuine issues for trial," then the burden shifts to the nonmoving party to show that an issue of material fact exists. *Becker v. Tenenbaum-Hill Assoc.*, 914 F.2d 107, 110-111 (7th Cir. 1990) (citations omitted); *see also Hong v. Children's Mem'l Hosp.*, 993 F.2d 1257, 1261 (7th Cir. 1993).

Once a properly supported motion for summary judgment is made, the non-moving party cannot resist the motion and withstand summary judgment by merely resting on its pleadings. *See* Fed. R. Civ. P. 56(e); *Donovan v. City of Milwaukee*, 17 F.3d 944, 947 (7th Cir. 1994). Rule 56(e) provides that "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion [or] grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it . . . ." Fed. R. Civ. P. 56(e)(2), (3); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986). Thus, to demonstrate a genuine issue of fact, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts," but must "come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis in original).

In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences in favor of that party. *See Anderson*, 477 U.S. at 255; *Srail v. Vill. of Lisle*, 588 F.3d 940, 948 (7th Cir. 2009); *NLFC, Inc. v. Devcom Mid-Am., Inc.*, 45 F.3d 231, 234 (7th Cir. 1995). A court's role is not

to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *See Anderson*, 477 U.S. at 249-50.

## MATERIAL FACTS

In November 2009, Ms. Cottle was a customer at Defendants' store 532, when she complained to her daughter about the poor service she was receiving. Farid Talukder, a market leader for Church's Chicken, was sitting at a table doing paperwork, and he overheard her and began a conversation with her. Ms. Cottle complained to Mr. Talukder about the poor service, and he responded that he was unable to motivate his employees to work. Ms. Cottle then responded that she had management experience. She testified that Mr. Talukder offered her a job as a shift manager. The paperwork indicates that Ms. Cottle was hired by Falcon Holdings, LLC on November 15, 2009, as a team member at store 532. In his deposition, Mr. Talukder testified that Ms. Cottle was in training to become a shift manager at the time of her termination.

Mr. Talukder hired Ms. Cottle that same day, and she began work the next day. Ms. Cottle testified that she never received a copy of Defendants' employee handbook, and no representative of Defendant ever reviewed its terms with her. Instead, Ms. Cottle testified that Mr. Talukder simply told Ms. Cottle that Defendants were hiring her at $9.00 per hour, gave her paperwork, told her to sign the paperwork, and said she could start working.

Mr. Talukder did not specifically remember reviewing Defendants' employee handbook with Ms. Cottle, nor did he remember reviewing the physical requirements for her job. He also did not remember reviewing any of Defendants' other hiring documents with Ms. Cottle. The application form completed by Ms. Cottle is for all positions, including both team member and shift manager.

Ms. Cottle never signed an employee handbook, because Store 532 had none available at the time she was hired.[1]

Ms. Cottle performed all functions that Defendants listed as job duties belonging to both a team member and a shift manager.[2] Ms. Cottle testified that both the store manager Monir Zaman and Mr. Talukder referred to her as a shift manager. When Mr. Talukder explained the job duties to Ms. Cottle, he outlined duties that belonged to the shift managers.

---

[1] Ms. Cottle cites to pages 178-179 of her deposition for this fact. However, the testimony on those two pages do not specifically reference an employee handbook; they reference only whether she signed a page contained within deposition exhibit 1. Ms. Cottle does not provide any reference to deposition exhibit 1 for the Court in connection with this citation. Ms. Cottle provided the Court with only the pages of her deposition that are cited in her brief; therefore, the Court cannot reference the opening pages of the deposition to determine the name of deposition exhibit 1. In contrast, Defendants submitted the full copy of Ms. Cottle's deposition transcript as Exhibit D. Page 3 of the transcript lists the deposition exhibits and identifies deposition exhibit 1 as "Handbook."

Ms. Cottle also includes the following statement in her Statement of Genuine Disputes, but which is unsupported by the cited evidence: "Jim Doughty ("Doughty"), a market leader with Defendants, testified that at the time Ms. Cottle was hired, it was not policy for the employee to sign the handbook." Pl. Br., p. 3 (citing Exh. 3, p. 33.). Exhibit 3 contains two pages. The first page is the deposition transcript cover page, identifying the deponent simply as "James Doughty." The second page is 33 of Mr. Doughty's deposition. On this page, Mr. Doughty discusses the various forms and videos that are part of a new employee's orientation. Regarding a company handbook, the only reference is the following exchange:

Q. Okay. And the actual checklist is that a list you go through and check off?
A. Yes. Yes.
Q. Is there a company handbook?
A. Yes.

Pl. Br., Exh. 3, p. 33. There is no reference on page 33, the only page of the deposition provided, to Mr. Doughty's position, who he worked for, or policies regarding the signing of a handbook. Therefore, the Court disregards this statement of fact because it is unsupported by the evidence.

[2] The Court notes that Ms. Cottle's exhibits that contain deposition excerpts include only those pages that she cites in her brief, which is permissible. Rather than providing the pages in numerical order, it appears that she has attempted to provide them in the order that they appear as citations in her Statement of Genuine Issues in her response brief. However, beginning with the citation on page 3 of her response brief to page 176 of her deposition (Exhibit 1) in support of the fact above in the text, the pages are no longer in the order that they appear in the brief and the Court is required to search through the packet of pages in Exhibit 1 to find the cited pages, both in order to check the evidence in support of the facts in the Statement of Genuine Issues as well as throughout her analysis.

Ms. Cottle's paychecks were paid at the hourly rate of $7.25 or $7.75 per hour.[3]  Ms. Cottle

testified that she "always argued" her rate of pay to Mr. Zaman, Mr. Talukder, and Aslam Khan,

who was the CEO of Falcon Holdings, LLC.[4]

Ms. Cottle received a violation notice for having too many chargebacks.[5]  A chargeback

occurs when a team member makes a cash register error and a manager cancels the transaction with

a pass code.  Only a shift manager has a code number enabling her to void a transaction entry.  Ms.

Cottle had a code number enabling her to void transactions.  The codes are given out by the IT

department from the corporate office in Texas.

A shift manager can close the store, and shift managers usually work the closing shift.  A

shift manager is also responsible for maintaining the "safety and security of the store floor."  Pl. Br.,

Exh. 4, p. 35 (Talukder dep.).

Mr. Talukder testified that training and signature of a written cash handling policy is required

before an employee can have a key, alarm code, and safe code to become a shift manager.[6]  Mr.

---

[3] This statement of fact as contained on page 3 of Ms. Cottle's brief contains additional information not supported by the citation to page 80 of Exhibit 1 and, thus, is not considered by the Court.

[4] This statement of fact as contained on page 3 of Ms. Cottle's brief contains additional information about Ms. Cottle complaining about her straight hourly rate of pay that is not supported by the citation to pages 80 and 182 of Exhibit 1 and to Exhibit 6.  The complaints discussed on page 182 of Exhibit 1 are regarding harassment and the complaints in Exhibit 6 are regarding the failure to pay overtime.   There are no references in the cited evidence to Ms. Cottle complaining about her hourly rate of pay.

[5] Ms. Cottle cites a date for this notice, but the deposition page cited in support, Exh. 1, p. 79, does not include a date.  *See* Pl. Br., p. 3.

[6] Again, the evidence cited in support of this statement does not fully support the statement.  Ms. Cottle cites page 93 of Mr. Talukder's deposition. *See* Pl. Br., p. 4.  There is no indication on page 93 of his deposition that the training he is describing is for becoming a shift manager.  The question that references becoming a shift manager that sets up the framework for Mr. Talukder's response on page 93 is found at the bottom of page 92.  Ms. Cottle does not cite page 92 in her brief and does not include page 92 of the deposition in Exhibit 1.  However, the Court was able to locate page 92 in Defendants' Exhibit D.

Talukder gave Ms. Cottle a shift manager's uniform, which has a different shirt than a team member shirt.

The decision to elevate a trainee to shift manager status is entirely within the discretion of the store manager. Mr. Talukder estimated two weeks as the typical length of such a training period for an employee working less than seven days per week. Ms. Cottle began such "training" after about a month into her employment, in December 2009, and had not completed that "training" at the time she was terminated in March 2010.

Ms. Cottle first complained to Mr. Zaman that she had not received overtime pay when she received her first paycheck in December 2009. She complained to Mr. Zaman after receiving every paycheck.

Although ethnically American Indian, Ms. Cottle regards herself as white in skin color. During her employment with Defendants, Ms. Cottle was the only white employee at store 532. All of the other employees were black, except for Mr. Zaman and his daughter Sara Zaman, who were of South Asian (Bangladeshi) origin.

Starting two or three weeks into her employment, Ms. Cottle's black coworkers began harassing her on the basis of her race or color, and that harassment continued every day while she worked there. Ms. Cottle complained to Mr. Zaman "every day" and "told him everything that was going on every day about the harassing;" she also complained to Mr. Talukder whenever he was present at store 532. Initially, all of her complaints were oral. But, in January 2010, she hand-delivered a written letter of complaint to Mr. Zaman, asking him to deliver it to Mr. Talukder. Ms. Cottle testified that neither Mr. Zaman nor Mr. Talukder said anything in response to her complaints nor did they take any remedial action.

After that, in early February 2010, Ms. Cottle sent an e-mail to Mr. Khan, complaining about her failure to receive pay at the proper rate and to receive overtime pay. Two days after she sent that e-mail, Ms. Cottle received a call at Store 532 from Aslam Khan.[7] During the call, which lasted half an hour, Ms. Cottle "reiterated all of [her] complaints" to Mr. Khan, including the fact that she was not being paid overtime, and Mr. Khan assured her that he would personally look into her allegations and resolve them.

Approximately one week later, James Doughty, another market leader for Defendants, visited store 532 as a result of Ms. Cottle's complaints. During Mr. Doughty's visit, Ms. Cottle complained to him about all the issues she had discussed with Mr. Khan in her e-mail. In response, Mr. Doughty offered Ms. Cottle a position as general manager in Joliet, Illinois, if Ms. Cottle would drop her claims and stop seeing her attorney. Ms. Cottle declined, and she received her notice of termination approximately two weeks later.

After Ms. Cottle emailed her complaint to Mr. Khan, Raza Choudhry, Mr. Talukder's supervisor, notified Mr. Talukder that Ms. Cottle had complained about not receiving payment for 180 or 190 hours worked and told Mr. Talukder and Mr. Zaman not to discuss the issue with Ms. Cottle.[8]

Mr. Zaman, the store manager, testified that he heard from Ms. Cottle's coworkers that she carried a gun at work, which he reported to Mr. Talukder, his supervisor. Mr. Talukder testified that

---

[7] Ms. Cottle asserts that Mr. Khan is "Defendants' CEO" but offers no evidence in support.

[8] Ms. Cottle represents that Mr. Talukder testified that Mr. Choudhry told him not "to discuss the issue with either Cottle or Zaman." Pl. Br., p. 6. However, the cited testimony provides: "When she complained to my supervisor and he stopped me and the manager not to talk with her." Pl. Br., Exh. 4, p. 87.

he received knowledge about Ms. Cottle's bearing a firearm at work after Ms. Cottle complained to Mr. Choudhry about her wage claims.

Mr. Talukder then contacted Mr. Choudhry, who told him to write down the allegations and send them to Defendants' human resources department. Following these instructions, Mr. Talukder obtained written statements from the employees who complained and sent them to the human resources department.[9] The employee letters state that Ms. Cottle was going to sue the company because she was not getting a manager's pay rate and that she carries a gun in her purse. One co-worker, Tiffany Finch, wrote that she overheard Ms. Cottle say that "Zaman and Farid" were taking hours off her check and she was owned[sic] 100 hours of lost or stolen time." Def. Br., Exh. C, p. 10.

On February 26, 2010, Lisa Anderson, Director of Human Resources & Risk Management, sent an email to Mr. Talukder, directing him to inquire of Ms. Cottle whether she did in fact have a gun and directing that she should be terminated based on the written statements of the other employees. On March 1, 2010, Mr. Talukder responded, indicating that Ms. Cottle admitted that she carried a gun in the store while she was working, that she responded that she always carried a gun and that she had a license, and that they filled out the paperwork for the violation of the company policy.

An "Employee Consecutive Counseling/Warning Form," dated March 1, 2010, indicates a First Disciplinary Report for Violation of Company Policy for carrying a gun in her purse while at work. On the same form, Ms. Cottle's response provides: "I have a license to carry my weapon &

---

[9] Ms. Cottle cites page 109 of Exhibit 4, which is Mr. Talukder's deposition in support of this statement, but Ms. Cottle did not include page 109 in Exhibit 4. The Court was able to review page 109, which is included in Defendants' Exhibit F.

Church's chicken doesn't have cameras or security panic alarm & I confirmed if OK with Gary Police Station Because a lot of nights I am alone leaving the store at 12 am. Because my workers leave me there to close or I have me and 1 young 18 yr. old closing the store in a very dangerous neighborhood." Def. Br., Exh. C., pp. 3-4.

Someone from the human resources department instructed Mr. Talukder to terminate Ms. Cottle's employment. A "Notice of Separation" dated March 1, 2010, indicates that she was being discharged for failure to follow company policy by willful misconduct, namely that she "carried gun in her purse when she is in work." Def. Br., Exh. C, p. 2.

On March 2, 2010, Ms. Anderson sent a confidential Notice of Dismissal letter to Ms. Cottle, informing her that her employment was terminated effective March 1, 2010, by Mr. Talukder for a Violation of Company Policy and citing the firearms and weapons prohibition.

Mr. Zaman was asked at his deposition if Ms. Cottle ever complained to him about anything while she was working at his store, and he responded, "No, she didn't bring any complaint to me." Def. Br., Exh. E, p. 88. Mr. Zaman did not know what Defendants' normal disciplinary procedures were, nor did he know if they were followed when Ms. Cottle was terminated.

Mr. Talukder was asked at his deposition whether "Ms. Cottle ever complain[ed] to [him] that she was being harassed or discriminated against by the African-American or other nonwhite employees?" Def. Br., Exh. F., p. 541. Talukder responded, "No." *Id.*[10]

Mr. Talukder learned that Ms. Cottle had contacted an attorney regarding her wage claims after Mr. Choudhry notified him of Ms. Cottle's complaints but before Ms. Cottle was terminated.

---

[10] In their brief, Defendants include as a material fact that "Defendants never received any complaints or notice regarding Cottle's allegation that she and other employees were not properly compensated for hours worked or were retaliated against because of said failure to pay proper wages." However, Defendants offer no citation to evidence in support of this statement. Therefore, the Court disregards this statement of fact.

At all relevant times, Defendants had a written company policy against discrimination, retaliation, and/or harassment of any kind.

Defendants also had a written company policy in their handbook prohibiting employees from possessing firearms on or inside company property:

> Firearms and weapons of any description (guns, knives, mace, blackjacks, etc.) are not to be carried onto Churchs property (this includes having them inside personal vehicles which are parked on Company property) by any employee either on or off duty. No weapons are to be stored in the restaurant. Failure to follow this policy will result in immediate termination.

Def. Br., Exh. B, p. 12 (Churchs Chicken Employees Handbook).

On November 16, 2009, Ms. Cottle and Mr. Zaman signed a form titled "Acknowledgment of Reading and Understanding (to Be Completed by All New Hires and Attached to the New Hire Package)," which contained "Rules and Regulations." Def. Br., Exh. A, p. 6. The introductory paragraph of the "Rules and Regulations" provides that violations of the rules "will result in a disciplinary action up to and including dismissal." *Id*. The twenty-three enumerated paragraphs prohibiting activities included "[u]nauthorized possession or use of firearms, fireworks, or any other weapon on Churchs property or while engaged in Churchs business." Def. Br., Exh. A, p. 7.[11]

At the time of her employment, Ms. Cottle had a valid license to carry a concealed handgun issued by the State of Louisiana. At no time between December 2009 and March 2010 did anyone from Church's ever mention anything to Ms. Cottle about a handgun. Ms. Cottle observed a coworker, Lashatay Garrett, possess a firearm at store 532. Ms. Cottle saw Ms. Garrett's boyfriend come into store 532 and hand Ms. Garrett a handgun, and Ms. Cottle saw Ms. Garrett put the

---

[11] Ms. Cottle cites to this document in her brief but describes it incorrectly as the "handbook." As noted above, the handbook contains a more full description of the prohibition.

handgun into her purse and place her purse in the storage room. Defendants' records indicate that Ms. Garrett remained employed at Store 532 until November 1, 2010.

At store 532, the timekeeping procedure was for an employee to enter a personal identification number into a computerized cash register, which would then clock in that employee. At the end of a shift, the employee would enter that number into the computer, which would then clock out the employee.

Ms. Cottle testified that Shana Cadwell, a shift manager at store 532, clocked out Ms. Cottle while Ms. Cottle was still working and when Ms. Cottle could not leave because she had more work to complete. She further testified that, when she would tell Ms. Cadwell that she was going to clock out, Ms. Cadwell frequently responded, "I already clocked you out a long time ago." Pl. Br., Exh. 1, p. 143.

Ms. Cottle described herself as "singled out to being emotionally and verbally abused on a daily basis," to the point where she "dread[ed] looking at even the parking lot or even having to go in there . . . ." Pl. Br., Exh. 1, p. 154-55. Ms. Cottle testified that her experiences at work caused problems in her domestic life. With her children, she would have anxiety attacks and snap at them because of holding in the distress all day at work. To deal with the distress, Ms. Cottle attended counseling at a mental health clinic in Merrillville, Indiana. She began taking Effexor XR and Xanax, beginning one month after she was terminated by Defendants.

Because of work, Ms. Cottle's hands and feet would swell so badly that her children would need to help her out of bed in the morning. While she was working her shifts at store 532, Ms. Cottle's hands would cramp and her legs would swell due to her Multiple Sclerosis ("MS"). She requested breaks simply to sit down. Ms. Cottle testified that Mr. Zaman refused her requests,

saying that employees "couldn't have breaks." Pl. Br., Exh. 1, p. 181.[12] Ms. Cottle testified that, since her employment with Defendants, her other employers have given her daily thirty-minute breaks at her request because of her MS. According to Mr. Talukder, Defendants' employees were allowed one break and could take more if needed, including for medical reasons. According to Mr. Zaman, any employee could take a break whenever she wanted.

Both Mr. Zaman and Mr. Talukder denied knowing that Ms. Cottle had MS or that she requested accommodations for her MS.

Mr. Zaman testified that Ms. Cottle was a hard worker and that he never had any problems with her performance.

## ANALYSIS

Defendants move for summary judgment on all but two of the individual claims in Counts I-VIII of the Amended Complaint. The Court considers each claim in turn.

### A. Title VII - Reverse Race Discrimination

In Count I of the Amended Complaint, Ms. Cottle alleges that Defendants intentionally discriminated against her in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, as amended, based on her color (white) and her race (Caucasian). More specifically, Ms. Cottle alleges that she was subjected to an adverse employment action based on the discrimination and that she was subject to different terms and conditions of employment than similarly situated employees of "black or African descent, or of Middle Eastern or South Asian descent." Am. Compl., ¶ 50. She also alleges that she was subjected to severe and pervasive

---

[12] Ms. Cottle also cites page 180 of Exhibit 1, but does not include that page for the Court's review.

harassment based on race by the employees of Defendants and that Defendants knew of the harassment and took no steps to stop it.

Title VII of the Civil Rights Act of 1964 provides, in part, that it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). In this case, Ms. Cottle alleges Title VII claims based on discrimination as well as on hostile work environment. The Court considers each in turn.

*1.     Discrimination*

An employee who alleges race discrimination under Title VII may proceed either under the direct or the indirect methods of proof. *Good v. Univ. of Chi. Med. Ctr.*, 673 F.3d 670, 672 (7th Cir. 2012) (citing *Egonmwan v. Cook County Sheriff's Dep't*, 602 F.3d 845, 849-50 & n.7 (7th Cir. 2010)). Ms. Cottle asserts in her brief that racial motivation for Defendants' adverse actions against her are evident by "both direct and indirect proof." Pl. Br., p. 10. Therefore, the Court considers both methods.

To survive summary judgment under the direct method, a plaintiff "must demonstrate a triable issue as to whether discrimination motivated the adverse employment action of which [she] complains." *Davis v. Time Warner Cable of Se. Wis., LP*, 651 F.3d 664, 672 (7th Cir. 2011) (citing *Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1114 (7th Cir. 2009)). Direct evidence can take the following forms: (1) an outright admission by the decisionmaker that the prohibited action was undertaken, or (2) circumstantial evidence of a discriminatory reason by the employer. *See Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003). The plaintiff can establish the latter through

a long chain of inferences, which has been described as "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Davis*, 651 F.3d at 672 (quoting *Silverman v. Bd. of Educ. of Chi.*, 637 F.3d 729, 734 (7th Cir. 2011)). Circumstantial evidence typically falls into one of the following categories:

> (1) suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group; (2) evidence, whether or not rigorously statistical, that similarly situated employees outside the protected class received systematically better treatment; and (3) evidence that the employee was qualified for the job in question but was passed over in favor of a person outside the protected class and the employer's reason is a pretext for discrimination.

*Darchak v. City of Chi. Bd. of Educ.*, 580 F.3d 622, 631 (7th Cir. 2009) (quoting *Sun v. Bd. of Trustees*, 473 F.3d 799, 812 (7th Cir. 2007)) (citing *Troupe v. May Dep't Stores, Inc.*, 20 F.3d 734, 736 (7th Cir. 1994)). However, "'smoking gun' evidence of discriminatory intent is hard to come by." *Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir. 2012) (citing *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716 (1983)).

Although Ms. Cottle asserts that there is "direct proof" of her race discrimination claim, which is that she was terminated based on her race,[13] she offers no argument or evidence in support. The three sentences of her brief that follow this assertion before she begins her analysis under the indirect method all deal with the harassment that she was subjected to by her coworkers and not with her termination. Thus, the Court finds that Ms. Cottle has not met, or attempted to meet, her burden to survive summary judgment under the direct method on her claim of reverse race discrimination.

---

[13] Under the indirect method discussed below, Ms. Cottle asserts that she also suffered a second adverse employment action when she was not paid a shift manager's wage when she performed shift manager's work. However, as set forth in that section, the Court finds that Ms. Cottle has offered no evidence that she was not paid a shift manager's wage.

A plaintiff proceeding under the indirect, burden-shifting method established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), must first establish a prima facie case of discrimination. *Good*, 673 F.3d at 678. If the plaintiff meets her burden of establishing a prima facie case, a rebuttable presumption of discrimination arises, and the burden shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for the challenged action. *McDonnell*, 411 U.S. at 802; *Good*, 673 F.3d at 679; see *Burks v. Wisconsin Dep't of Transp.*, 464 F.3d 744, 751 (7th Cir. 2006). If the defendant provides a legitimate, nondiscriminatory reason for its actions, the burden shifts back to the plaintiff to offer evidence indicating that "the proffered reason is actually a pretext for illegal discrimination." *Grigsby v. LaHood*, 628 F.3d 354, 359 (7th Cir. 2010) (citing *Adelman-Reyes v. Saint Xavier Univ.*, 500 F.3d 662, 666 (7th Cir. 2007)); *see also Good*, 673 F.3d at 679.

To establish a prima facie of reverse race discrimination, a plaintiff has the burden of establishing: (1) "background circumstances that demonstrate that a particular employer has reason or inclination to discriminate invidiously against whites or evidence that there is something fishy about the facts at hand;" (2) "she suffered an adverse employment action;" and (3) she was treated less favorably than similarly situated individuals who are not members of the protected class." *Good*, 673 F.3d at 678 (internal quotation marks omitted) (quoting *Phelan v. City of Chicago*, 347 F.3d 679, 684-85 (7th Cir. 2003) (altering the first prong of the indirect case to account for reverse nature of race discrimination) (quoting *Mills v. Health Care Serv. Corp.*, 171 F.3d 450, 455 (7th Cir. 1999); *Peele Country Mut. Ins. Co.*, 288 F.3d 319, 329 (7th Cir. 2002) ("When a plaintiff produces evidence sufficient to raise an inference that an employer applied its legitimate expectations in a

disparate manner . . . the second and fourth prongs of *McDonnell Douglas* merge . . . ."));[14] *see also*

*Henry v. Jones*, 507 F.3d 558, 564 (7th Cir. 2007).[15]

In this case, Ms. Cottle has established that she suffered an adverse employment action, namely, her termination. Ms. Cottle also asserts that she suffered the adverse employment action of not being compensated at the rate of a shift manager while performing the duties of a shift manager. Ms. Cottle testified that she performed the job duties of a shift manager, and Mr. Talukder testified that Ms. Cottle was in training to become a shift manager. Ms. Cottle's initial hourly pay rate was $7.25. At some point, she received a raise of $.50 for an hourly rate of $7.75. Mr. Talukder testified that the pay raise for a shift manager was $.50. *See* Pl. Br., Exh. 4, p. 94 (Talukder dep.). Thus, the evidence of record, viewed in the light most favorable to Ms. Cottle, is that she received a raise commensurate with that of a promotion to shift manager. Thus, Ms. Cottle has not established for purposes of summary judgment that she suffered an adverse employment action of not being compensated at the rate of a shift manager while performing the work of a shift manager. The Court further notes that Ms. Cottle has not alleged or offered evidence that she was not paid a shift manager's wage *because of her race*.

Although she has established that she was terminated at the second prong, Ms. Cottle has failed to establish the first prong and third prongs, both of which are argued by Defendants in support of summary judgment. As to the first prong, Ms. Cottle must establish "background

---

[14] In this case, there is no dispute that Ms. Cottle was performing her job to the satisfaction of her employer. Mr. Zaman testified in his deposition that Ms. Cottle "was a hard worker" who performed her job duties satisfactorily. *See* Pl. Br., Exh. 2, p. 98.

[15] In her brief, Ms. Cottle cites case law from the Second Circuit Court of Appeals for the position that, in discrimination cases, the showing a plaintiff must make as to the elements of the prima facie case is "de minimis." Pl. Br., p. 10 (citing *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994)). This is not a statement of law articulated by the Seventh Circuit Court of Appeals, and Ms. Cottle does not cite any Seventh Circuit law in support.

circumstances that demonstrate that a particular employer has reason or inclination to discriminate invidiously against whites or evidence that there is something fishy about the facts at hand." *Good*, 673 F.3d at 678. Defendants argue that, while Ms. Cottle was the only white/Caucasian employee at store 532, the fact is not evidence of any inclination to discriminate against whites.[16] As noted by Defendants, the most recent data from the United States Census bureau puts the non-white/non-Caucasian population of Gary, Indiana, at 89.3%. *See* United States Dep't of Commerce, United States Census Bureau, State & County QuickFacts, http://quickfacts.census.gov/qfd/states/18/1827000.html (last visited Sept. 23, 2012). At her deposition, Tiffany Finch, Ms. Cottle's co-worker, was questioned about the racial makeup of store 532's employees and was asked: "And have there ever been any white employees at your Church's Chicken?" Def. Br., Exh. I, p. 34. She responded:

> Since I have worked there, no. They don't run in there looking for applications at that particular store and in that particular city so no. I have not seen any other than any white people or Asians or I see what's living in that neighborhood. That's who come in and ask for applications. We don't - - you know, they are not just - - people are not just riding up and down Gary. They are trying to get out of Gary. They are not trying to stop and put an application in.

*Id*. at 34-35. Notably, Ms. Cottle does not address this element of the prima facie case in her response brief and, thus, has offered no evidence of background circumstances nor has she attempted to explain how the facts at hand might be "fishy." The Court finds that Ms. Cottle has not established the first element of the prima face case.

As to the third prong, Ms. Cottle must show that she was treated less favorably than similarly situated individuals who are not members of the protected class. In support of this prong, Ms. Cottle

---

[16] Defendants assert that they employ hundreds of whites/Caucasian employees across the United States in 160 stores but offer no evidence in support of this fact. Therefore, the Court disregards this assertion.

points to her testimony that she observed Lashatay Garrett, a black team member at store 532, possess a handgun on Defendants' premises during work hours. She argues that this testimony flies in the face of Defendants' assertion in their brief that no other employees at Defendants' store have ever brought and admitted to bringing a gun on Defendants' property or into the store. However, Ms. Cottle has offered no evidence that Defendants *knew* that Ms. Garrett had a gun at work; Defendants cannot be expected to have disciplined Ms. Garrett if they did not know of the alleged violation. In this material respect, Ms. Cottle and Ms. Garrett are not similarly situated. *See Caratachea v. Homewood Indus.*, No. 01 C 9845, 2002 WL 31844997, *5 (N.D. Ill. Dec. 18, 2002) (citing *Mechnig v. Sears, Roebuck & Co.*, 864 F.2d 1359, 1366 (7th Cir. 1988) (holding that party responsible for termination must also know about similarly situated employees to sustain liability)). Therefore, Ms. Cottle has not established the third element of the prima facie case.

Because Ms. Cottle cannot establish a prima facie case of reverse race discrimination, the Court grants summary judgment in favor of Defendants on her Title VII reverse race discrimination claim in Count I.

2.     *Hostile Work Environment*

As noted above, Ms. Cottle alleges in Count I that she was subjected to severe and pervasive harassment based on race by the employees of Defendants and that Defendants knew of the harassment and took no steps to stop it.[17] Defendants do not move for summary judgment on Ms.

---

[17]A hostile work environment exists "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal citations and quotation marks omitted). To prevail on a racial harassment claim, a plaintiff must have sufficient evidence to create a material issue of fact as to four elements: "(1) the work environment must have been both subjectively and objectively offensive; (2) [her] race must have been the cause of the harassment; (3) the conduct must have been severe or pervasive; and (4) there must have been a basis for employer liability." *Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 390 (7th Cir. 2010) (citing *Chaney v. Plainfield Healthcare Ctr.*, 612 F.3d 908, 912 (7th Cir. 2010)).

Cottle's claim for hostile work environment. Thus, Ms. Cottle's claim for a racially hostile work environment in Count I remains pending.

## B. Title VII - Retaliation

Retaliating against an employee for engaging in protected activity is prohibited by Title VII. 42 U.S.C. § 2000e-3(a); *Egan v. Freedom Bank*, 659 F.3d 639, 642 (7th Cir. 2011). As with discrimination claims, an employee alleging retaliation may proceed under either the direct or indirect method. *Silverman v. Bd. of Educ. of City of Chi.*, 637 F.3d 729, 740 (7th Cir. 2011). "To avoid summary judgment on a retaliation claim under the direct method, [Ms. Cottle] must produce evidence from which a jury could conclude: '(1) that she engaged in a statutorily protected activity; (2) that she suffered a materially adverse action by her employer; and (3) there was a causal link between the two.'" *Bernuzzi v. Bd. of Educ. of City of Chi.*, 647 F.3d 652, 664 (7th Cir. 2011) (quoting *Silverman*, 637 F.3d at 740). A plaintiff relying on the direct method of proof may establish the causal link with direct evidence or by demonstrating "a 'convincing mosaic' of circumstantial evidence" that would permit an inference of discrimination. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011) (quoting *Rhodes*, 359 F.3d at 504 (quoting *Troupe*, 20 F.3d at 737)).

Under the indirect method, a plaintiff must show that "(1) [s]he engaged in statutorily protected activity; (2) [s]he met the employer's legitimate expectations; (3) [s]he suffered an adverse employment action; and (4) [s]he was treated less favorably than similarly situated employees who did not engage in statutorily protected activity." *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006) (quoting *Moser v. Ind. Dep't of Corr.*, 406 F.3d 895, 903 (7th Cir. 2005)).

In Count II of her Amended Complaint, Ms. Cottle alleges that she exercised her statutory right to complain about what she regarded as race discrimination and racial harassment and that Defendants took adverse employment action against her because of the complaints. In other words, Ms. Cottle alleges (1) that she was retaliated against for complaining about race discrimination and (2) that she was retaliated against for complaining about a racially hostile work environment. In their Motion for Summary Judgement, Defendants do not distinguish between these two claims. Regardless, the Court considers them, separately, in turn.

1.    *Retaliation for Complaining about Reverse Race Discrimination*

As to her claim that she was retaliated against for complaining about reverse race discrimination, the Court finds that Ms. Cottle has dropped this claim. She does not support this claim in her brief. Nor could she; her claim of reverse race discrimination was based solely on her termination. This is not a case in which the plaintiff was racially discriminated against and suffered an adverse employment action that did not terminate her employment (e.g. decrease in wages, demotion) and engaged in the protected activity of complaining about the racial discrimination. Rather, in this case, the adverse employment action that Ms. Cottle allegedly suffered as a result of reverse racial discrimination was her termination; as a result, there was no opportunity for Ms. Cottle to complain about the reverse discrimination or suffer retaliation for those complaints because she was no longer employed by Defendants.

As noted in the previous section, to the extent Ms. Cottle has attempted to argue that she suffered an adverse employment action during her ongoing employment based on not getting paid a shift manager's wage for doing shift manager's work, she has not raised a genuine issue of material

fact that she did not receive a shift manager's hourly wage. Moreover, nowhere does she argue that she did not get a shift manager's wage because of her race.

Accordingly, the Court finds that Ms. Cottle has not raised a genuine issue of material fact that she was retaliated against for complaining about race discrimination and grants summary judgment for Defendants on this claim in Count II of the Amended Complaint.

Finally, the Court notes that, without citation to law, Defendants' opening argument in this section of its brief on Title VII retaliation is that, because Ms. Cottle's reverse race discrimination claim fails, her claim of retaliation must fail as well. Def. Br., p. 11. This is not the law. For a plaintiff to show that she engaged in protected conduct in support of her retaliation claim, she must demonstrate that "she reasonably believed in good faith that the practice she opposed violated Title VII," even if the opposed action does not in fact violate Title VII. *Fine v. Ryan Int'l Airlines*, 305 F.3d 746, 752 (7th Cir. 2002) (quoting *Alexander v. Gerhardt Enters., Inc.*, 40 F.3d 187, 195 (7th Cir. 1994)); *see also Leitgen*, 630 F.3d 668, 674 (7th Cir. 2011) (citing *Tate v. Exec. Mgmt. Servs., Inc.*, 546 F.3d 528, 532 (7th Cir. 2008); *Fine*, 305 F.3d at 752); *Durkin v. City of Chicago*, 341 F.3d 606, 615 (7th Cir. 2003) ("[A]n employee may engage in protected activity under § 2000e-3 even if the conduct at issue does not violate Title VII")); *Dey v. Colt Const. & Dev. Co.*, 28 F.3d 1446, 1457 (7th Cir. 1994) (same).

2.    *Retaliation for Complaining about Hostile Work Environment*

Ms. Cottle alleges that she was retaliated against for complaining about racial harassment. In their brief in support of summary judgment, Defendants argue that Ms. Cottle must "produce credible and reliable evidence that the Defendants subjected her, and non-white similarly situated employees who opposed similar impermissible discrimination, to an adverse employment action

even though she was performing her job satisfactorily" and then asserts that Ms. Cottle "has no evidence that a non-white, similarly situated employee was disciplined, or not, by the same decision maker who imposed the adverse employment decision." Def. Br., p. 11.[18]  But this is not the correct standard for retaliation.  The question is not whether someone of a different race did not get disciplined (that is the standard for race discrimination); the question is whether someone who did not engage in statutorily protected activity (complaining of race discrimination or racially hostile work environment) who was otherwise similarly situated was disciplined, or not, by the same decisionmaker who imposed the adverse employment decision on Ms. Cottle.  This is the fourth element of the prima facie case under the indirect method.

In her brief, Ms. Cottle again identifies Ms. Garrett as a similarly situated individual; Ms. Cottle asserts that Ms. Garrett also carried a handgun at work but did not complain about protected activity and she was not disciplined for carrying the handgun at work whereas Ms. Cottle was.  The Court has already found that Ms. Cottle has failed to establish that Defendants knew that Ms. Garrett had a handgun at work; thus, Ms. Garrett cannot be similarly situated for purposes of analyzing Ms. Cottle's termination as an adverse employment action.  Ms. Cottle cannot make out a prima facie

---

[18] In support of this standard, Defendants cite *Little v. Illinois Dep't of Revenue*, 369 F.3d 1007, 1011-12 (7th Cir. 2004).  In *Little*, the Seventh Circuit Court of Appeals addressed both a claim for race discrimination and a claim for retaliation in violation of Title VII.  On page 1011, the court sets out the test for a prima facie case of race discrimination: "He must show that (1) he was a member of a protected class; (2) he was performing his job satisfactorily; (3) the employer took an adverse employment action against him; and (4) the employer treated at least one similarly situated individual outside of his protected class more favorably." *Id.* at 1011.  In the following paragraph, the court sets forth the standard for prevailing on a Title VII retaliation claim under the indirect method: "[He] must establish a prima facie case that the employer subjected him, and not any similarly situated employee who did not oppose impermissible discrimination, to an adverse employment action even though he was performing his job satisfactorily, . . . ." *Id.* (internal citation omitted).  The court then considered the sole issue whether the similarly-situated employee was disciplined, or not by the same decision maker. *Id.* at 1012. (Defendants do properly cite *Little* for this element).  Nowhere, however, does *Little* stand for the proposition that to prove a retaliation claim, the plaintiff must show that the similarly situated person is of a different race. The standard is whether the similarly situated person did not oppose impermissible discrimination.

case of retaliation under the indirect method for having complained of a racially hostile work environment.

However, Ms. Cottle's response brief also attempts to survive summary judgment under the direct method of proof. Ms. Cottle argues that she has produced evidence on which a jury could conclude that she complained about a racially hostile work environment, that her employment was terminated, and that there was a causal connection between her complaints and her termination. The Court disagrees because none of the evidence before the Court demonstrates that Ms. Cottle complained about racial harassment in any of these contacts; the evidence produced by Ms. Cottle demonstrates that all of her complaints regarded her rate of pay and unpaid overtime.

First, Ms. Cottle argues that she complained of her coworkers' racial harassment and of her managers' refusal to take any corrective action in her email to Defendants' corporate level (Mr. Khan) and in her telephone conversation with Mr. Khan. In support, Ms. Cottle cites pages 105-06, 100, and 182 of her deposition. On page 105, Ms. Cottle is asked a question referencing an affidavit that she submitted to the EEOC setting forth her claims;[19] neither party has submitted the EEOC affidavit to the Court. Ms. Cottle is asked:

> Q.    So it says in here - - in the next paragraph, page 14, it says about two days after I e-mailed Aslam he called me on the phone at work and told me not to tell anyone that he was on the phone. I walked with the cordless phone in to the back office to speak with him.
>       So it's your testimony that Aslam Khan called you at the company number at the Gary, Indiana store?
> A.    Yes.

---

[19] In her brief, Ms. Cottle offers no explanation for the reference to an "affidavit" in the questioning on page 105 of the deposition transcript. In an effort to understand this reference, the Court reviewed the pages leading up to page 105 as found in the copy of the deposition transcript submitted by Defendants in Exhibit D. On page 97 of her deposition transcript, Ms. Cottle is asked, "Do you remember signing an affidavit that you sent to the EEOC basically laying out support of your allegations against. . . ." Def. Br., Exh. D, p. 97. Ms. Cottle responded, "Yes." *Id*. at p. 98. The questions in the subsequent pages, including page 105, reference this EEOC affidavit.

> Q.   Okay.  What did you all talk about?
>
> A.   Everything I complained about.

Pl. Br., Exh. 1, p. 105.  Nothing on the remainder of page 105 or on page 106 mentions a complaint of racial harassment.  No evidence is submitted to show what "everything" that she complained about to Mr. Khan may have included.  Ms. Cottle also cites page 110, which begins with her testifying, "But every time I had a paycheck it never changed, and I complained every paycheck." Pl. Br., Exh. 1, p. 110.  She was asked if she ever complained in writing, and she responded, "Yes, when I had e-mailed Aslam."  *Id*.  Nothing on the remainder of page 110 references racial harassment.  Finally, on page 182, Ms. Cottle testifies that she complained daily to Mr. Zaman about her co-workers' harassment and that she complained to Mr. Talukder when he came to the store; nothing on page 182 indicates that she complained to Defendants' corporate level about racial harassment.  Therefore, Ms. Cottle has not established the first element of direct evidence.

Second, Ms. Cottle meets the second element because her employment was terminated.

Third, Ms. Cottle cannot show circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker because there is no evidence that the decisionmaker–at Defendants' corporate level–knew that Ms. Cottle had complained about racial harassment.  In addition to the discussion with Mr. Khan, Ms. Cottle also improperly relies on the visit from Mr. Doughty who, she argues, "spoke with her about her claims."  Pl. Br., p. 14. However, the pages of her deposition that she cites in support, pages 106, 112, and 117, do not make any reference to her discussing racial harassment with Mr. Doughty.  On page 106, she is asked a question referencing her EEOC affidavit, which apparently indicated that the call with Mr. Khan lasted 30 minutes and that he told her he would personally check on "all of [her] allegations and take care of it."  Pl. Br., Exh. 1, p. 106.  She then testified that she did not hear anything further from Mr.

Khan but that she received a call and a visit from Mr. Doughty. None of this testimony references racial harassment. Page 112 simply explains that Mr. Doughty came to the store in early to mid-February and was there for eight hours. On page 117, Ms. Cottle was asked "And what did you tell Jim?" she answered vaguely, "Everything that was going on." Pl. Br., Exh. 1, p. 117. The next question was, "Basically everything you've got here in . . . your affidavit?" *Id.* She responded, "Yes." *Id.* This is again a reference to Ms. Cottle's EEOC affidavit that has not been submitted to the Court. Notably, the affidavit dated July 9, 2012 that Ms. Cottle has submitted as Exhibit 6 in support of her response brief makes no averments regarding complaints she may have made about racial harassment; the entirety of her Affidavit concerns her complaints regarding her rate of pay and unpaid overtime. Finally, other pages of her deposition, submitted by Ms. Cottle but not cited in this section in support of this argument, reference the email to Mr. Khan and provide that the email complained about her rate of pay without reference to racial harassment. *See* Pl. Br., Exh. 1, pp. 80-81.

Therefore, the Court finds that Ms. Cottle has not carried her burden on the direct method of demonstrating a triable claim for Title VII retaliation based on complaints of racial harassment, as alleged in Count II, and grants summary judgment in favor of Defendants on this claim. The Court addresses as a separate issue below whether many of these same facts support a claim for retaliation based on Ms. Cottle asserting her right to overtime wages under the Fair Labor Standards Act.

### C. ADA - Discrimination

Ms. Cottle alleges in Count III of her Amended Complaint that Defendants failed to provide reasonable accommodations to her as a qualified individual with a disability and otherwise

discriminated against her based on her disability in violation of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq*., as amended ("ADA"). Once again, the parties are like ships passing in the night. Defendants move for summary judgment only on Ms. Cottle's discrimination claim (based on her termination) and do not move for summary judgment on her failure to accommodate claim whereas Ms. Cottle's response addresses only her failure to accommodate claim but does not argue her discrimination claim. The Court considers each claim in turn.

*1.    Discrimination*

To establish a prima facie case of disability discrimination, a plaintiff must prove that (1) she is disabled within the meaning of the ADA, (2) she is qualified to perform the essential functions of the job, either with or without a reasonable accommodation, and (3) she suffered from an adverse employment action because of her disability." *Hoppe v. Lewis Univ.*, – F.3d – , –, No. 11-3358, 2012 WL 3764717, *4 (7th Cir. Aug. 31, 2012) (citing *Nese v. Julian Nordic Const. Co.*, 405 F.3d 638, 641 (7th Cir. 2005)).

Defendants argue that Ms. Cottle has no evidence that her employer knew or had reason to know about her disability or that her employment was terminated because of her disability. Ms. Cottle offers no response in support of a claim that she was discriminated against based on her disability, much less that she was terminated because of her disability. Accordingly, the Court grants summary judgment in favor of Defendants on Ms. Cottle's claim in Count III that she was discriminated against because of her disability in violation of the ADA.

*2.    Failure to Accommodate*

"The ADA requires an employer to make reasonable accommodations that will allow a 'qualified individual with a disability' to perform the essential functions of his or her job." *Miller*

*v. Ill. Dep't of Transp.*, 643 F.3d 190, 197 (7th Cir. 2011) (citing 42 U.S.C. § 12112(b)(5)(A)).

"Under the ADA, a failure to make reasonable accommodations for a known disability constitutes unlawful discrimination." *Mobley v. Allstate Ins. Co.*, 531 F.3d 539, 545 (7th Cir. 2008) (citing 42 U.S.C. §§ 12112(b)(5)(A), 12112(a)). To prevail on a failure to accommodate claim, a plaintiff must establish that "(1) she is a qualified individual with a disability; (2) the employer was aware of the disability; and (3) the employer failed to reasonably accommodate the disability." *Id.* (quoting *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 797 (7th Cir. 2005)). As part of the third element, the "'ADA requires that employer and employee engage in an interactive process to determine a reasonable accommodation.'" *Id.* (quoting *Sears, Roebuck & Co.*, 417 F.3d at 797)). As part of their argument against Ms. Cottle's ADA discrimination claim, Defendants concede that Ms. Cottle was disabled with multiple sclerosis ("MS") and that she was qualified for her job, with or without reasonable accommodation.

Defendants do not move for summary judgment on Ms. Cottle's failure to accommodate claim. Nevertheless, in their argument against Ms. Cottle's ADA discrimination claim, Defendants contend that they were not aware of her disability, which is also an essential element of the prima facie case for her failure to accommodate claim. Defendants cite the deposition testimony of Mr. Zaman, who was Ms. Cottle's general manager, and Mr. Talukder, who was Mr. Zaman's supervisor, in which both testify that Ms. Cottle never advised them that she had a disability and that they had never learned that she had a disability. Defendants also assert that Tiffany Finch, Ms. Cottle's co-worker, testified that she was unaware that Ms. Cottle had a disability and had never heard her complain that she had a disability. Ms. Finch's testimony does not inform the question of

whether Ms. Cottle told Mr. Zaman and/or Mr. Talukder about her MS or whether they had reason to know of it.

Nevertheless, Ms. Cottle has not offered any evidence to contradict Mr. Zaman and Mr. Talukder's testimony that they did not know about her disability; again, the assertions made in her brief to the contrary are not supported by the cited evidence. First, Ms. Cottle asserts that she "confronted Zaman, her store manager, about her MS and asked to be given short breaks to allow herself to recover." Pl. Br., p. 16. In support, Ms. Cottle cites page 180-81 of her deposition, but only provides the Court with page 181. The Court has reviewed page 180 contained in Exhibit D to Defendants' brief. There is no testimony on either page that she informed Mr. Zaman that she had MS or that when she asked for breaks she informed him that the breaks were because of her MS.[20] Her testimony is that she asked for breaks, that she asked for them because of her MS, and that Mr. Zaman refused her breaks, but conspicuously absent is any testimony that she told Mr.

---

[20] The following is the relevant questioning found on pages 180-81 of Ms. Cottle's deposition transcript:

| | |
|---|---|
| Q. | Did you ever ask for breaks? |
| A. | Yes, a lot of times. |
| Q. | Why? |
| A. | Because either I was hurting and I needed a break  - - I mean, on long shifts you get hungry.  I get tired.  My hands were cramping.  My legs swell up.  Just want to sit down. |
| Q. | And this was at Church's? |
| A. | Yes. |
| Q. | While you were employed at Church's? |
| A. | Yes. |
| Q. | And was this because of your MS? |
| A. | Yes. |
| Q. | Did you receive those breaks? |
| A. | No. |
| Q. | Who denied them to you? |
| A. | We weren't even told - - we were told we couldn't have breaks. |
| Q. | Well, I mean, you asked for them, correct? |
| A. | Yes. |
| Q. | Were you told no? |
| A. | Yes,. |
| Q. | Who told you [no]? |
| A. | Zaman. |

Def. Br., Exh. D., pp. 180-81.

Zaman that she was asking for the breaks because of her MS. Ms. Cottle also notes that, although Mr. Zaman and Mr. Talukder give different versions of Defendants' policy for employee breaks, they both agreed that an employee who needed a break for medical reasons could take one. This is irrelevant to her failure to accommodate claim if they were not told that Ms. Cottle had MS and needed breaks. Finally, Ms. Cottle cites her July 9, 2012 Affidavit, attached as Exhibit 6, for the statement that Mr. Zaman refused to allow her to take breaks; there is no reference to taking breaks in her Affidavit.

The Court finds that Ms. Cottle has not raised a genuine issue of material fact as to whether her employer knew that she had MS. As a result, she cannot make out a prima facie case in support of her failure to accommodate claim, and the Court grants summary judgment in favor of Defendants on Ms. Cottle's ADA claim for failure to accommodate in Count III.

### D. ADA - Retaliation

In Count IV, Ms. Cottle alleges that she exercised her statutory rights to complain about what she regarded as a failure by Defendants to provide reasonable accommodations for her disability and that Defendants took adverse action against her because of her complaints in violation of the ADA.

"The ADA's retaliation provision prohibits employers from 'discriminat[ing] against any individual because [he] has opposed any act or practice made unlawful by [the ADA] or . . . has made a charge [under the ADA].'" *Kersting v. Wal–Mart Stores, Inc.*, 250 F.3d 1109, 1117 (7th Cir. 2001) (quoting 42 U.S.C. § 12203(a)). As with discrimination claims, a plaintiff can establish a valid case of retaliation under the ADA using either the direct or indirect method of proof. *Dickerson v. Bd. of Trustees*, 657 F.3 d595, 601 (7th Cir. 2011) (citing *Kersting*, 250 F.3d at 1117). Under the direct method of proof, a plaintiff must establish that (1) she engaged in a statutorily

protected activity; (2) she suffered an adverse action; and (3) there is a causal connection between the two. *Id.* (citing *Casna v. City of Loves Park*, 574 F.3d 420, 426 (7th Cir. 2009)). Under the indirect, burden-shifting method for retaliation claims, a plaintiff must demonstrate that she (1) engaged in protected activity; (2) was performing her job satisfactorily; and (3) was singled out for an adverse employment action that similarly situated employees who did not engage in protected activity did not suffer. *Id.* at 601-02 (citing *Lloyd v. Swifty Transp., Inc.*, 552 F.3d 594, 601 (7th Cir. 2009)).

Defendants correctly argue that Ms. Cottle offers no evidence of retaliation under the ADA, either under the direct or indirect methods. Not only does Ms. Cottle offer no evidence that she ever told her supervisors that she has MS, she also offers no evidence that she complained to anyone about a failure to accommodate her MS. As with the ADA failure to accommodate claim, none of the deposition pages that Ms. Cottle cites in support of her retaliation claim contain any testimony that she "complained about Zaman's failure to accommodate her MS to Talukder, and ultimately to Khan, among all her other complaints." Pl. Br, p. 17 (citing Exh. 1, pp 80-81, 105-06, 182; Exh. 6). Therefore, the Court grants summary judgment in favor of Defendants on Ms. Cottle's claim of retaliation in violation of the ADA in Count IV.

### E. FLSA

In Count V, Ms. Cottle alleges her Fair Labor Standards Act ("FLSA") cause of action as an opt-in collective action pursuant to 29 U.S.C. § 216(b). Ms. Cottle alleges that Defendants failed to compensate Ms. Cottle and the collective action plaintiffs at a rate of not less than one and one-half times the regular rate of pay for work performed in excess of forty hours in a work week in violation of the FLSA, 29 U.S.C. § 201, *et seq.*, including 29 U.S.C. § 207(a)(1). Ms. Cottle also

alleges that Defendants' conduct constituted a willful violation of the FLSA as defined in 29 U.S.C. § 255(a).

Under the FLSA, it is unlawful for an employer to employ an employee "for a workweek longer than forty hours . . . unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(2)(C). An employer who violates this provision "shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages." 29 U.S.C. § 216(b).

A plaintiff "has the burden of proving that [she] performed overtime work for which [she] was not properly compensated, and if [she] contends that [her] employer's records are not accurate . . . then [she] must 'produce sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference.'" *Turner v. The Saloon, Ltd.*, 595 F.3d 679, 691 (7th Cir. 2010) (quoting *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946), *superseded on other grounds by statute*, Portal-to-Portal Act of 1947, 29 U.S.C. §§ 251-262).

Defendants argue that they have provided detailed time and payroll records for Ms. Cottle, establishing the hours she worked and the rate she was paid. Some of the records show that on two dates, Ms. Cottle was compensated at a rate of one and one-half times her base salary for a few overtime hours. *See* Def. Br., Exh. H, pp. 2 (bates stamp FALCON 00455), 13, 15, 17, 22, 25, 28.

However, Ms. Cottle responds that these records do not reflect the actual number of hours she worked. She testified under oath that Shana Cadwell, a shift manager at store 532, clocked out Ms. Cottle while Ms. Cottle was still working and that Ms. Cottle could not leave because she had

more work to complete.  Ms. Cottle further testified that, when Ms. Cottle would tell Ms. Cadwell that she was going to clock out, Ms. Cadwell frequently responded, "I already clocked you out a long time ago."  Pl. Br., Exh. 1, p. 143.  Likewise, in her verified Affidavit, Ms. Cottle avers that her manager, Mr. Zaman, also clocked her out at least ten times:

> 4.  During my employment with Church's Chicken, I regularly worked more than forty hours in a workweek.
> 5.  During my employment with Church's Chicken, [sic] was never paid overtime pay.
> 6.  During my employment with Church's Chicken, I was regularly "clocked out" while I was still working.  I discovered this when I would go to clock out and was told that I had been clocked out already.
> 7.  I did not even receive my regular rate of pay for that time I was clocked out before my work was finished.
> 8.  The people who told me that they had clocked me out before I was done working included Shana Caldwell, a shift manager from another store who occasionally worked at my store, and Monir Zaman, the manager of my store.  In fact, I estimate that Monir Zaman told me that he had clocked me out no less than ten times.
> 9.  Through conversations with my co-workers, including Fred Culbreath, I learned that my co-workers were also not paid overtime wages.  In one conversation with a co-worker, Fred Culbreath, he laughed when I complained about not getting overtime.  He had told me that he had worked there for nine years and no one ever got paid overtime.

Pl. Br., Exh. 6.  Thus, based on her testimony, Ms. Cottle has raised a genuine issue of material fact as to whether she worked overtime for which she was not compensated.

Defendants also argue that Ms. Cottle has failed to develop or produce any evidence establishing the number of hours she alleged working for which she claims she was not properly compensated, despite discovery requests for this information.  Ms. Cottle testified in her deposition that she has logs reflecting this information, and she testified that she turned them over in this lawsuit.  *See* Def. Br., p. 143.  Defendants represent in their brief, without citation to admissible evidence, that Ms. Cottle has not produced this evidence.  Ms. Cottle has also submitted her answers

to Defendants' First Set of Interrogatories. Interrogatory No. 9 asks Ms. Cottle to detail and itemize all damages that she claims to have sustained because of the incident(s) that form the basis of her claims. Her answer includes: "$6,409.00 ($7.25/hr x (55 minus 3) hrs/wk x7 weeks from 1/1/10 to 5/2/10) lost wages from retaliatory reduction in hours" and "$2,463.77 ($3.62/hr x 680.6 hours) unpaid overtime." Pl. Br., Exh. 5. The Court finds that Ms. Cottle has offered sufficient evidence to create a jury issue on the question of hours worked and damages on her FLSA claim for unpaid overtime wages. Thus, the Court denies the Motion for Summary Judgment as to Count V of the Amended Complaint.

## F. FLSA Retaliation

In Count VI, Ms. Cottle alleges that she exercised her statutory right to complain about what she regarded as failure by Defendants to pay overtime wages and that Defendants took adverse action against her because of her complaints.

The FLSA makes it unlawful for any person "to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding . . . ." 29 U.S.C. § 215(a)(3). An employer who violates this provision "shall be liable for such legal or equitable relief as may be appropriate to effectuate the purposes of [29 U.S.C. § 215(a)(3)], including without limitation employment, reinstatement, promotion, and the payment of wages lost and an additional equal amount as liquidated damages." 29 U.S.C. § 216(b). A "complaint" for purposes of 29 U.S.C.§ 215(a)(3), includes both oral and written complaints. *Kasten v. St.-Gobain Perf. Plastics Corp.*, 131 S. Ct. 1325, 1336 (2011). An oral complaint "must be sufficiently clear and detailed for a reasonable employer to understand it,

in light of both content and context, as an assertion of rights protected by the statute and a call for their protection." *Id. at* 1335.

Ms. Cottle may prove a claim of retaliation through either the direct or indirect methods of proof. *Ridings v. Riverside Med. Ctr.*, 05-2134, 2006 WL 3478091 (C.D. Ill. Nov. 30, 2006) *aff'd*, 537 F.3d 755 (7th Cir. 2008) (citing *Haywood v. Lucent Tech., Inc.*, 323 F.3d 524, 531 (7th Cir. 2003)). Defendants move for summary judgment on this claim under the indirect method, and Ms. Cottle responds in kind. To establish a prima facie case of retaliation under the FLSA, Ms. Cottle must show: (1) she engaged in a protected activity under FLSA; (2) she suffered an adverse employment action; and (3) there was a causal link between the two. *Bradford v. Vill. of Lombard*, 11 C 00037, 2012 WL 1655966, *2 (N.D. Ill. May 10, 2012) (citing *Stutler v. Ill. Dept. of Corr.*, 263 F.3d 698, 702 (7th Cir. 2001); *Scott v. Sunrise Healthcare Corp.*, 195 F.3d 938, 940 (7th Cir. 1999)). Once Ms. Cottle establishes a prima facie case, Defendants bear the burden of producing a legitimate, non-discriminatory reason for terminating her employment. *Krieg v. Pell's Inc.*, IP00-1230-C-T/K, 2002 WL 449797, *8 (S.D. Ind. Jan. 28, 2002) (citing *Conner v. Schnuck Markets, Inc.*, 121 F.3d 1390, 1394 (10th Cir. 1997)). If Defendants discharge this burden, Ms. Cottle must present evidence that the reason offered is a pretext for retaliation. *Id.*

Ms. Cottle has offered testimony that she believed that Defendants were failing to pay proper overtime wages and that she made verbal and written complaints to management.[21] She began

---

[21] Once again, some of the evidence Ms. Cottle cites does not support her argument. *See* Pl. Br., p. 20 (citing Exh. 1, pp 80-81, 105-06, 182; Exh. 6). Ms. Cottle first cites pages 80-81 of her deposition; however, there is no discussion on these pages of complaints of unpaid overtime; rather, she is complaining about her rate of pay. Similarly, the statements on page 105-06 regarding her phone conversation with Mr. Khan describe her complaints in general terms and do not specify any complaint of unpaid overtime. Ms. Cottle's testimony on page 182 also does not address any claim of unpaid overtime; rather, it discusses her complaint about her coworkers harassment to Mr. Zaman and Mr. Talukder.

complaining to Mr. Zaman about unpaid overtime shortly after beginning her employment at Church's Chicken. Mr. Zaman ignored her complaints and took no action. She also complained to Mr. Talukder about the unpaid overtime. Eventually, Ms. Cottle complained to Mr. Khan, the CEO of Falcon Holdings, LLC, by email, informing him that she was not getting paid for overtime hours worked. Two days after her email, Mr. Khan called Ms. Cottle at work and told her not to tell anyone that he was on the phone. They spoke for thirty minutes, during which time she discussed her complaint that she was not being paid overtime. Mr. Khan told her that he would personally check into her complaints, but she never had any indication that he did.

Just prior to being fired, Church's Chicken learned that Ms. Cottle had met with a lawyer. Ms. Cottle knows this because Mr. Talukder offered Ms. Cottle a promotion in exchange for dropping her claims. Also, Mr. Doughty, another market leader for Defendants, met with Ms. Cottle at the store to encourage her to drop her claims in exchange for a promotion. At first, Ms. Cottle agreed; however, she then later changed her mind and told Mr. Talukder by cell phone that she was declining the offer. Ms. Cottle states that she was fired a day later. Mr. Talukder confirmed this timeline in his deposition: Defendants' human resources department instructed him to terminate Ms. Cottle after it was aware of her complaints regarding the overtime.

Based on this evidence, the Court finds that Ms. Cottle has offered sufficient evidence to lead a reasonable juror to believe that, once Ms. Cottle complained of her unpaid overtime at the corporate level (the protected action) and once she declined their offer of a promotion to drop her claims, her employment was terminated (the adverse employment action). Thus, Ms. Cottle has established a prima facie case of retaliation.

However, Defendants have discharged their burden of articulating a legitimate, nonretaliatory reason for Ms. Cottle's termination. Ms. Cottle was terminated for a violation of a written company policy, namely carrying a firearm on or in store property, which, under the handbook, is grounds for immediate termination. Defendants conducted an investigation once they learned that she had a handgun at work, and Ms. Cottle admitted to violating the policy. Mr. Zaman and Mr. Talukder testified that they thought she was a good worker and that she would not have been fired if she had not violated the company policy.

Ms. Cottle may show that this reason was a pretext for retaliation by showing that (1) Defendants' non-discriminatory reason was dishonest and (2) Defendants' true reason was based on a discriminatory intent." *Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 396 (7th Cir. 2010) (citing *Stockwell v. City of Harvey*, 597 F.3d 895, 901 (7th Cir. 2010)). For her FLSA relation claim, Ms. Cottle refers back to her arguments in support of her Title VII retaliation claim, in which she argues that the "evidence of pretext is strong," Pl. Br., p. 13; however, the only evidence of pretext she offers is that she observed coworker Ms. Garrett at work with a handgun and that Ms. Garrett was not disciplined. As set forth above in Part A.1 of this Order, Ms. Cottle has not established that Defendants *knew* that Ms. Garrett brought a firearm to work. Thus, Ms. Cottle has not offered any evidence that Defendants knew of any other employees who violated the firearms policy but did not discipline them or terminate their employment.

Ms. Cottle also argues suspicious timing in that no adverse action was taken against Ms. Cottle on account of her firearm possession until after she had sent a complaint to Defendants' corporate level about her failure to receive overtime. The pages of her own deposition cited in support of this argument do not address the timing of when the allegations of the handgun were first

reported to either her supervisor or the corporate office. However, Mr. Talukder testified, when asked about how he first learned that Ms. Cottle had brought a handgun to the store: "When she complained to my supervisor and he stopped me and the manager not to talk with her. And by this time, I don't ask her anything. And on that time, the employee started complaining that she's carrying a gun, they don't want to work with her." Pl. Br., Exh. 1, p. 57. He stated that he learned of the gun from employees, that when he visited the store, they complained to him, and because he had been prohibited by his supervisor from speaking with Ms. Cottle because of the issues with her unpaid overtime complaints, he did not speak with Ms. Cottle directly; instead, he informed his supervisor, who in turn told Mr. Talukder to make a written report. *Id*. at 58. Mr. Talukder solicited the written statements from the employees and sent a written report to human resources. He then met with Ms. Cottle, reported the results of his meeting to human resources, and was informed by human resources to terminate Ms. Cottle's employment. All of Mr. Talukder's testimony, viewed in the light most favorable to Ms. Cottle, indicates that he learned of the firearm policy violation *after* Ms. Cottle complained to the corporate office and after he had been told not to have any more contact with her. Ms. Cottle has not offered any evidence to question the manner in which corporate management learned that Ms. Cottle had a handgun at work or to question the timing of when corporate management learned about her gun.

Because Ms. Cottle has not established that Defendants' legitimate, nondiscriminatory reason for her termination–that she brought a handgun to work in violation of the company handbook–was a pretext for discrimination, Ms. Cottle's FLSA retaliation claim fails. The Court grants summary judgment in favor of Defendants on Count VI of Ms. Cottle's Amended Complaint.

## G.  Negligent Retention and Supervision

Ms. Cottle alleges a claim of negligent retention and supervision in Count VII of her Amended Complaint, alleging that Defendants "knew, or in the exercise of ordinary care, should have known of the necessity for exercising control over their employees, because they had actual notice of harassment of Plaintiff based on race, and were in a position to prevent further harassment by those employees."  Am. Compl., ¶ 78.

Indiana law recognizes a cause of action against an employer for negligent hiring and retention of an employee. *See Levinson v. Citizens Nat'l Bank of Evansville*, 644 N.E.2d 1264, 1269 (Ind. Ct. App. 1994).  The standard set forth in Restatement (Second) of Torts § 317 governs these claims.  *Konkle v. Henson*, 672 N.E.2d 450, 454 (Ind. Ct. App. 1996).  Section 317 provides:

> A master is under a duty to exercise reasonable care so to control his servant while acting outside the scope of his employment as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them, if:
> (a)  the servant
>  (i)  is upon the premises in possession of the master or upon which the servant is privileged to enter only as his servant
>  (ii)  is using a chattel of the master, and
> (b)  the master
>  (i)  knows or has reason to know that he has the ability to control his servant, and
>  (ii)  knows or should know of the necessity and opportunity for exercising such control.

Restatement (Second) of Torts § 317.  For claims of negligent hiring and negligent retention, a plaintiff must demonstrate that the employer knew the offending employee had a "habit of misconduct" at the time of the hiring or retention.  *Levinson*, 644 N.E.2d at 1269.

First, the tort of negligent hiring and supervision is inapplicable when an employee is acting within the scope of employment.  *See* Restatement (Second) of Torts § 317, cmt. a (1965) ("The rule

stated in this Section is applicable only when the servant is acting outside the scope of his employment. If the servant is acting within the scope of his employment, the master may be vicariously liable under the principles of the law of Agency. See Restatement of Agency, Second, Chapter 7."); *Clark v. Aris, Inc.*, 890 N.E.2d 760, 765 (Ind. Ct. App. 2008); *Bd. of School Com'rs of City of Indianapolis v. Pettigrew*, 851 N.E.2d 326, 332 (Ind. Ct. App. 2006); *Tindall v. Enderle*, 320 N.E.2d 764, 767-68 (Ind. Ct. App. 1974) (observing that the tort of negligent hiring of an employee arises "only when an . . . employee steps beyond the recognized scope of his employment to commit a tortious injury upon a third party."). Because Ms. Cottle's allegations all concern events during what appear to be work hours and within the scope of their employment, Ms. Cottle cannot prevail on a claim of negligent hiring and retention.

Second, Ms. Cottle has not identified any specific individual who harassed her. This lack of specificity is fatal to her claim because, under Indiana law, a claim of negligent hiring and retention requires proof that Defendants knew or should have known that the employee was in the habit of engaging in misconduct. *Treat v. Tom Kelley Buick Pontiac GMC, Inc.*, 710 F. Supp. 2d 762, 772 (N.D. Ind. 2010) (recognizing that, to bring a cause of action for negligent hiring and retention, a plaintiff must show that the employer hired and retained an employee in its employ despite knowing that the employee was in the "habit of misconducting herself in a manner dangerous to others") (quoting *Briggs v. Finley*, 631 N.E.2d 959, 967 (Ind. Ct. App. 1994)). Some courts in Indiana find "that an employer may be liable if it merely should have known or had reason to know of the misconduct." *Hansen v. Bd. of Trustees of Hamilton Se. Sch. Corp.*, 551 F.3d 599, 609-10 (7th Cir. 2008) (citing *Grzan v. Charter Hosp. of Nw. Ind.*, 702 N.E.2d 786, 793 (Ind. Ct. App. 1998) (holding that a defendant must have known or "had reason to know" of the misconduct and failed

to take appropriate action); *Konkle*, 672 N.E.2d at 460; *Frye v. Am. Painting Co.*, 642 N.E.2d 995, 998 (Ind. Ct. App. 1994)).

Regardless of the standard, Ms. Cottle has not identified a specific person who harassed her, and, even if she had, Ms. Cottle has not offered any specific evidence that her supervisors knew, should have known, or had reason to know about that given person's propensity for offensive behavior. For example, for a claim of negligent hiring, Ms. Cottle would have to identify an offending individual and then prove that Defendants knew, should have known, or had reason to know that the individual had a "habit of misconduct" prior to being hired. Likewise, for a claim of negligent retention, Ms. Cottle would have to identify an offending individual and then prove that, after the individual was hired, Defendants knew, should have known, or had reason to know of the individual's "habit of misconduct" and retained the individual as an employee. General references by Ms. Cottle to Mr. Zaman's ambivalence about the employees' general behavior are insufficient. *See* Pl. Br., Exh. 1, p. 182.[22]

The Court finds that Ms. Cottle has not raised a genuine issue of material fact as to her claim of negligent hiring and retention and, thus, grants summary judgment in favor of Defendants on Ms. Cottle's claim for negligent hiring and retention pled in Count VII of the Amended Complaint.

### H. Intentional Infliction of Emotional Distress

Finally, in Count VIII, Ms. Cottle alleges that Defendants intentionally and/or recklessly inflicted emotional distress on her by harassing her based on her race, discriminating against her, and retaliating against her. She alleges that this conduct was so outrageous in character and so

---

[22] Ms. Cottle also cites Exhibit 6 to her brief, which is her July 9, 2012 Affidavit, in support of certain statements she says Mr. Zaman made about her coworkers. *See* Pl. Br., p. 20-21. However, there are no references in Exhibit 6 to anything Mr. Zaman said about her co-workers or, for that matter, anything regarding her allegations of racial harassment. Therefore, the Court does not considers these assertions.

extreme in degree as to go beyond the pale of decency and be regarded as intolerable in a civilized society. Because Ms. Cottle's discrimination and retaliation claims do not survive summary judgment, the Court considers only this claim based on her allegations of racial harassment.

The Indiana Supreme Court has defined the tort of intentional infliction of emotional distress as: "one who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another." *Cullison v. Medley*, 570 N.E.2d 27, 31 (Ind. 1991). "It is the intent to harm the plaintiff emotionally which constitutes the basis for the tort." *Johnson ex rel. Indiana Dep't of Child Servs. v. Marion County Coroner's Office*, 971 N.E.2d 151, 162 (Ind. Ct. App. 2012) (citing *Cullison*, 570 N.E.2d at 31). The tort of intentional infliction of emotional distress occurs when the defendant (1) engages in extreme and outrageous conduct (2) which intentionally or recklessly (3) causes (4) severe emotional distress to another. *Id.* (citing *Cullison*, 570 N.E.2d at 31). The requirements to prove this tort are rigorous. *Id.* (citing *Cullison*, 570 N.E.2d at 31).

The Indiana Court of Appeals has explained that the conduct giving rise to a claim of IIED must be even beyond extreme:

> The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or by a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'

*Leathermon v. Grandview Mem'l Gardens, Inc.*, 4:07-CV-137, 2011 WL 2445980 (S.D. Ind. June 15, 2011) (quoting *Bradley v. Hall*, 720 N.E.2d 747, 752-53 (Ind. Ct. App. 1999) (quoting Restatement (Second) of Torts cmt. d)).

Notably, nowhere in this section does Ms. Cottle set out the offensive statements made by her coworkers. She refers only generally to "her experiences at work," "the statements," and "the harassment." Pl. Br., p. 21. Nor does she identify the offensive statements in her statement of genuine issues at the opening of her brief or elsewhere in her brief.[23] Thus, there are no specific statements or actions for the Court to assess under the standard set out above, and the Court finds that Ms. Cottle has not raised a genuine issue of material fact as to any actions or statements that rise to the level of outrageousness required for a claim of intentional infliction of emotional distress. Although Ms. Cottle testified that she sought some therapy and was prescribed Xanex and Effexor as a result of the severity of her experiences at work, this treatment, without any reference to any offensive conduct, does not meet the standard.

Moreover, in order to prove that the employer of the offending employees intended the harm, the Indiana Supreme Court has held that a showing of mere negligence is insufficient, "even if the negligence could be characterized as reckless or wanton." *Holbrook v. Lobdell-Emery Mfg. Co.*, 219 F.3d 598, 601 (7th Cir. 2000) (citing *Baker v. Westinghouse Electric Corp.*, 637 N.E.2d 1271, 1275 (Ind. 1994)). The employee must prove that the employer deliberately intended to inflict an injury or that the employer had actual knowledge that an injury is certain to occur. *Id.* The Indiana

---

[23] In Part IV.A.2 of her response brief, in support of her hostile work environment claim, Ms. Cottle states that the "names her coworkers used to describe her – 'white devil,' 'white bitch,' 'fat white ass' - - are both demeaning to a reasonable person and clearly motivated by race." Pl. Br., p. 12. In support, she cites her answer to Interrogatory No. 10, found in Exhibit 5 and to her July 9, 2012 Affidavit, which is Exhibit 6. Neither document lists the names that her coworkers called her, and there is no reference at all in her Affidavit to racial harassment. Therefore, the Court does not consider this assertion on page

Supreme Court "emphasized that it is the employer itself that must have intended the injury, rejecting a respondeat superior analysis." *Id.* In order to impute tortious intent to an employer that is a legal entity or artificial person, the employee must show either that "(1) the corporation is the tortfeasor's alter ego, or (2) the corporation has substituted its will for that of the individual who committed the tortious acts." *Id.* (quoting *Perry v. Stitzer Buick GMC, Inc.*, 637 N.E.2d 1282, 1287 (Ind. 1994).

> [T]to prevail under the alter ego theory, the employee must show that both ownership and control of the corporation are in the tortfeasor's hands. To succeed under the other theory, the employee must show that the individual who committed the tort was acting pursuant to a policy or decision made through the corporation's regular decision-making channels by those with authority to do so. The employee's injury must be shown to be the intended product of the policy or decision at issue if the plaintiff is to prevail.

*Id.* (internal citations omitted).

Even if Ms. Cottle had identified sufficiently outrageous behavior by her coworkers to rise to the level of intentional infliction of emotional distress, Ms. Cottle has offered no evidence or argument to impute tortious intent on Defendants. All of the complained of conduct was allegedly committed by employees of Defendants, and not by any of her supervisors or by corporate personnel. Nor is the fact that Ms. Cottle complained to Mr. Zaman and Mr. Talukder about the harassment with no action taken by them sufficient to impute the actions of her coworkers to the company. Ms. Cottle asserts in her brief that she complained to Mr. Khan about the harassment, but this is not supported by the cited evidence of record, which provides that she only complained to Mr. Khan about the failure to pay overtime wages.

Thus, the Court finds that, because Ms. Cottle has failed to raise a genuine issue of material fact on her claim of intentional infliction of emotional distress, summary judgment in favor of Defendants on this claim in Count VIII is proper.

**CONCLUSION**

Based on the foregoing, the Court hereby **GRANTS in part** and **DENIES in part** Defendant Falcon Holdings Management, LLC's Motion for Summary Judgment [DE 87].

The following claims remain pending for trial: (1) hostile work environment based on race in violation of Title VII (Count I) and (2) failure to pay overtime wages under the FLSA (Count V).

The Court **REAFFIRMS** the September 27, 2012, 2:00 p.m. Final Pretrial Conference and the October 29, 2012 trial setting.

So ORDERED this 24th day of September, 2012.

s/ Paul R. Cherry
MAGISTRATE JUDGE PAUL R. CHERRY
UNITED STATES DISTRICT COURT

cc:     All counsel of record